## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MICHAEL BAKER | ) | Civil Action No.19-9157 |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | SECTION:  M (4) |
| vs. | ) | |
| | ) | |
| EXACTECH, INC. and | ) | JUDGE BARRY W. ASHE |
| EXACTECH US, Inc., | ) | |
| | ) | |
| Defendants. | ) | MAGISTRATE JUDGE KAREN ROBY |
| | ) | |

### AMENDED COMPLAINT AND JURY DEMAND

COMES NOW the Plaintiff, Michael Baker (hereinafter also referred to as "Plaintiff"), by and through undersigned counsel and submits this Complaint and Jury Demand against Exactech, Inc. ("Exactech") and Exactech US, Inc. ("Exactech US") (collectively "Defendants") for compensatory damages, equitable relief, and such other relief deemed just and proper arising from the injuries to Plaintiff Michael Baker, as a result of his injuries suffered as a direct and proximate result of Defendants' designing, developing, testing, assembling, manufacturing, packaging, labeling, preparing, distributing, marketing, supplying, warranting and/or selling the defective device sold under the name "Optetrak" total knee replacement system (hereinafter also referred to as the "Optetrak Implant" or  "Defective Device"). In support, Plaintiff alleges the following:

### INTRODUCTION

1.      Defendants, directly or through their agents, apparent agents, servants, and/or employees designed, developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, warranted and/or sold the Optetrak Implant for the use as a total knee replacement.

2.      Defendants concealed, and continue to conceal, their knowledge of the Optetrak Implant's unreasonably dangerous risks from Plaintiff, Plaintiff's physicians and medical providers, other consumers, and the medical community at large.

3.      As a result of the defective nature of the Optetrak Implant, persons who were implanted with an Optetrak Implant including Plaintiff, have suffered, and may continue to suffer, severe and permanent personal injuries, including a painful knee revision surgery to remove or revise the Defective Device, continued rehabilitation, medical care, and possible additional surgeries. Plaintiff was implanted Optetrak Implants.

4.      After being implanted with Optetrak Implant, Plaintiff experienced pain and other symptoms, and as a direct and proximate result of the Defendants' actions and inaction, Plaintiff required revision surgery of the left knee to remove the Defective Device and was implanted with additional Optetrak Implant component parts that is currently causing extreme pain, discomfort and disability. The Optetrak Implants were defective, unreasonably dangerous, defectively designed, defectively manufactured, and caused permanent injury and damage to Plaintiff.

5.      Plaintiff could not reasonably have discovered the injury and its cause before the date of his revision surgery on April 10, 2018 or the date in which the findings were discussed by his surgeon. No recall has occurred, and Defendants continue to deny responsibility for the Defective Device's premature failure due to premature polyethylene wear and/or tibial base plate loosening resulting from manufacturing and design defects in the Optetrak Implant. The earliest Plaintiff could have reasonably been expected to discover that the Defective Device caused his injuries was April 10, 2018 for the device that was previously revised. The pain and injury related to failures of the second Optetrak Implant occurred thereafter and recently worsened.

2

6.      The components of the Defective Device were defective, unreasonably dangerous and failed, resulting in a revision surgery and subsequent infection, pain and suffering.

7.      The Optetrak Implant was defective for the following reasons:

a. the device contained an inadequate polyethylene component constructed with conventional polyethylene rather than more wear-resistant, stronger and available highly cross-linked polyethylene material ;

b. the device contained a polyethylene component with inadequate thickness, which, in combination with the size of the perimeter capture in the posterior region of the tibial tray, created greater sensitivity to wear, cold-flow and delamination;

c. the device contained a polyethylene component which was negligently designed with a built in slope, which further concentrated stress and overloaded forces on an already inadequate polyethylene component material;

d. the device contained a configuration that leads to impingement between the edges of the patella leading to scar tissue and dislocation;

e. the device did not include precautions or instructions for use for implanting physicians regarding sensitivity to excessive polyethylene wear when positioned with greater slope;

f. failed to provide instruction and precautions to implanting physicians regarding alignment and rotation to avoid stresses and overloaded forces given the sensitivity in the design and weakness of materials that left the device prone to excessive polyethylene wear;

h. otherwise designing a product that overburdened forces and concentrated stress on a polyethylene component already prone to excessive polyethylene wear; and

g. otherwise providing inadequate precautions and instructions for use to physicians to account for the design and materials issues (identified above), including, but not limited, restrictions for use on certain patients based upon physical characteristics.

8.      Advances have taken place in the orthopedic industry to produce polyethylene that has superior wear characteristics and resistance to cold flow, delamination, oxidation, and overall wear. Despite these known advances, predating the time-frame of the manufacture, marketing and sale of the Defective Device implanted in Plaintiff, the Defendant failed to incorporate these advances into the Defective Device and consciously chose to use an inferior polyethylene insert in the Defective Device.

9.      These latent conditions and diseases and their relationship to the latent defects in the first Optetrak Implant were identified after Plaintiff's revision surgery of April 10, 2018 and the observations made therefrom and could not have been discovered prior to that time. The injuries related to the second Optetrak Implant were not discovered until the later in 2018.

10.     This is a product liability action for failure to warn, misrepresentation, and strict liability against Defendants.

11.     Plaintiff brings this action for personal injuries suffered as a proximate result of being implanted with the Defective Devices. Plaintiff accordingly seek compensatory damages, monetary restitution, and all other available remedies provided to Plaintiff under equity and law as a result of injuries caused by the implantation of the Defective Devices and for Defendants' conduct.

**PARTIES**

12.     At all times relevant hereto, Plaintiff was a resident and citizen of Springfield, Livingston Parish, Louisiana. As a result of the implantation of the Defective Device, Plaintiff

suffered personal and economic injuries and sought treatment for the effects of the injuries that were the direct and proximate result of the implantation of the Defective Device and Defendants' conduct.

13.    Defendant Exactech, Inc. is a for-profit Florida corporation with its principal place of business at 2320 NW 66th CT, Gainesville, Florida, 32653. Exactech's stated business purpose is to "develop, manufacture, market, distribute and sell orthopedic implant devices, related surgical instrumentation and biologic services to hospitals and physicians in the United States and internationally"[1] and to introduce its products, including the Defective Device, into interstate commerce, either directly or indirectly through third parties or related entities

14.    Exactech US, Inc. was incorporated in the state of Florida and maintains its principal place of business at 2320 NW 66th Court, Gainesville, Florida.  Exactech US, Inc., a wholly owned subsidiary of Defendant Exactech, Inc., is registered to do business in Louisiana and has a registered agent at National Registered Agents, Inc., 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816 and can be served at that address.

15.    Defendant Exactech Inc.'s "U.S. sales and distribution activities are conducted by [its] wholly owned subsidiary Exactech US, Inc."[2] and Exactech U.S., Inc. is engaged in the business of designing, developing, testing, assembling, manufacturing, packaging, labeling, preparing, distributing, marketing, supplying, warranting, selling, and introducing its products, including the Defective Device, into interstate commerce, either directly or indirectly through third parties or related entities.

---

[1] Exactech 2015 Form 10-k, p. 2. https://www.exac.com/resource-library/investors/recent-filings/10-k-annual-report-1
[2] *Id.*

5

16.     Collectively, Exactech, Inc. and Exactech US, Inc. are referred to in this pleading as "Exactech" or "Defendants."

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over Defendants in this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and because the amount in controversy exceeds $75,000 exclusive of interest and costs, and because, among other reasons, Defendants have significant contacts with this district by virtue of doing business within this judicial district.

18.     The Court has supplemental jurisdiction over the remaining common law and state law claims pursuant to 28 U.S.C. § 1367.

19.     At all times relevant to this action, Defendants engaged, either directly or indirectly, in the business of designing, developing, testing, assembling, manufacturing, packaging, labeling, preparing, distributing, marketing, supplying, warranting, selling, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the Defective Device, within the State of Louisiana with a reasonable expectation that the products would be used or consumed in this state, has a registered agent within the State of Louisiana and thus regularly solicited or transacted business in this state.

20.     At all times relevant to this action, Defendants were engaged in disseminating inaccurate, false, and/or misleading information about the Defective Device to health care professionals in the State of Louisiana, including Plaintiff's physicians and medical providers, with a reasonable expectation that such information would be used and relied upon by physicians and medical providers throughout the State of Louisiana, including but not limited to:

    a.   false representations of duration and survival of the components lasting longer than other knee implants because of proprietary use of materials and processes to give superior wear characteristics;

    b.   false claims of greater forgiveness to sub-optimal implantation conditions.

21.    At all times relevant to this action, Defendants failed to provide material information to implanting surgeons which was crucial to the safe implantation of the Defective Device, including, but not limited to:

    a.   the Defective Device could not withstand patent generated forces typically expected of similar implants;

    b.   the Defective Device was sensitive to polyethylene wear if not implanted at the proper angle and with the proper slope; and

    c.   healthcare professionals were routinely reporting early failure of the devices due to polyethylene wear.

22.    At all times relevant to this action, Defendants failed to investigate reports of failing devices received from healthcare professionals, the FDA, and other sources, and therefore failed to provide adequate information regarding the cause of the failures of implanting physicians.

23.    At all times relevant to this action, Defendants failed to report known failures brought to their attention by healthcare professionals and the FDA through the Manufacturer and User Facility Device Experience ("MAUDE") system, and, therefore, denied the FDA material data and inhibited the FDA from determining whether the Defective Device was a safe and effective product for consumers.

24.    Defendants have made subsequent design changes to the Optetrak products without notifying healthcare professionals or patients that such changes were made in response to Exactech's knowledge of early failure rates of its Optetrak products.

25.    Defendants engaged in substantial business activities in the State of Louisiana. At all relevant times, Defendants transacted, solicited, and conducted business in Louisiana through their employees, agents, and/or sales representatives and derived substantial revenue from such business in Louisiana. Said activities included the promotion, sale, and use of the Defective Device.

26.    Further, Defendants committed torts in whole or in part against Plaintiff in the State of Louisiana. As such, this Court has personal jurisdiction over all named defendants.

27.    Venue is proper within this district pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiff because the defective Optetrak Implants were implanted in Plaintiff and the revision surgery occurred within this district, which were a substantial part of the acts and/or omissions giving rise to these claims.

**FACTUAL BACKGROUND**

28.    At all times material hereto, Defendants designed, developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, warranted and/or sold the Defective Devices under various versions of the name "Optetrak."

29.    Upon information and belief, the first Optetrak knee device became available to be implanted in a patient in 1994.

30.    Since 1994, Defendants have obtained 510(k) clearance for various Optetrak devices and tibial inserts including the Optetrak PS, Optetrak Hi-Flex PS, Optetrak Finned Tibial

Tray, Optetrak Offset Tibial Tray, Optetrak RBK Tibial Insert, Optetrak RBK Tibial Tray, Optetrak CR Slope, and Optetrak Logic.

31.     A typical knee replacement surgery, referred to as a total knee arthroplasty ("TKA"), is performed under general anesthesia. The primary indication for TKA is to relieve severe pain associated with arthritis and may also be used to correct knee trauma or minor knee deformities.

32.     During the TKA procedure, the surgeon will make an approximately 8-10 centimeter incision on the front of the leg over the knee.

33.     The surgeon will then prepare the femur portion of the knee, the distal femur.  This process includes removing any diseased bone and drilling a hole in the femur in which to implant the femoral component of the device.  The surgeon will then place a femoral implant onto the distal femur using surgical cement.

34.     Next, the surgeon will prepare the proximal tibia, the bone located at the bottom of the knee. The tibial preparation includes removing diseased bone, properly aligning the tibial tray, and drilling a hole in which to implant the tibial tray. The tibial tray is then implanted using surgical cement.

35.     A third product, the tibial insert, is a polyethylene product implanted between the femoral implant and tibial tray.

36.     Defendants, through marketing materials disseminated to the general public, promoted their Optetrak devices as a system with three decades of clinical success and proven outcomes for patients around the world because of an improved articular design resulting in low polyethylene stresses.

37.    The allegations in this Complaint relate to the early failure of the Defective Device, its patella component and its polyethylene tibial component.

38.    Defendants designed, developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, warranted and/or sold the Optetrak Implants.

39.    Upon information and belief, Defendants became aware of a high rate of early failures Optetrak Implants.

40.    In 2012, "Poor results of the Optetrak cemented posterior stabilized knee prosthesis after a mean 25-month follow-up: Analysis of 110 prostheses" was published in Orthopaedics and Traumatology, volume 98, issue 4, pages 413-420. The article concluded "the small size of the tibial keel does not seem to resist the stresses applied by the ultracongruent shape of the posterior stabilization of this implant and the increase in intercondyloid eminence height."

41.    This article also identified a defect related to the patella component concluding "[i]n cases of centering defect, the design of the trochlea can lead to impingement between the edges of the patella and the prominent edges of the prosthetic trochlea."

42.    The Australian joint registry is an authoritative source that the medical community and industry look to in calculating prosthetic survival rates.

43.    In the 2016 Australian Registry Annual Report, the compared revision of TKA that had a primary diagnosis of osteoarthritis ("OA"), which is 97% or all diagnosis, as installed in Plaintiff, was reported as:

    a.  Not statistically significant rate of revision at 1 year;

    b.  Optetrak was statistically significant (range not overlap; 3.9>2.8) at 3 years;

    c.  Optetrak was statistically significant (range not overlap; 56>3.7) at 5 years;

d.  Both Optetrak and Optetrak-RBK had significantly increased rates of revision at 7
years.

**Table KT6    Cumulative Percent Revision of Primary Total Knee Replacement by Primary Diagnosis**

| Primary Diagnosis | N Revised | N Total | 1 Yr | 3 Yrs | 5 Yrs | 7 Yrs | 10 Yrs | 15 Yrs |
|---|---|---|---|---|---|---|---|---|
| Osteoarthritis | 17213 | 482373 | 1.0 (1.0, 1.1) | 2.7 (2.7, 2.8) | 3.6 (3.6, 3.7) | 4.4 (4.3, 4.4) | 5.3 (5.2, 5.4) | 7.3 (7.1, 7.6) |

| Femoral Component | Tibial Component | N Revised | N Total | 1 Yr | 3 Yrs | 5 Yrs | 7 Yrs | 10 Yrs | 15 Yrs |
|---|---|---|---|---|---|---|---|---|---|
| Optetrak-PS | Optetrak | 159 | 2398 | 1.5 (1.1, 2.1) | 4.7 (3.9, 5.7) | 6.6 (5.6, 7.8) | 7.9 (6.7, 9.2) | 9.6 (8.1, 11.4) | |
| Optetrak-PS | Optetrak-RBK | 37 | 720 | 1.6 (0.9, 2.8) | 3.9 (2.7, 5.9) | 5.3 (3.7, 7.5) | 6.9 (4.9, 9.7) | | |

44.  The Australian registry identifies "the Optetrak" as an implant with a higher than
expected rate of revision. The figures below are the survival curves where the 95% confidence
intervals do not overlap. The hazard ratio reported is high. The p value of p<0.001 means that the
hazard ratio is statistically significant.



2016 Australian Registry Annual Report Pg 343

| Femoral/Tibial | N Revised | N Total | Obs. Years | Revisions/100 Obs. Yrs | Hazard Ratio, P Value |
|---|---|---|---|---|---|
| Optetrak-PS/Optetrak-PS | 13 | 55 | 405 | 3.21 | Entire Period: HR=5.86 (3.40, 10.09),p<0.001 |

2016 Australian Registry Annual Report Pg 348

45.    Put into perspective, the cumulative percent revision of primary total knee replacement with cemented Optetrak (which is the type of Optetrak Implant installed in Plaintiff) as compared with all other reported cemented knees was:

    a.    The second worst mean percent failure rate of 4.7% as compared with all other cemented knees at 3 years;

    b.    The Optetrak bearing tied for worst failure rate of 6.6% at 5 years as compared to all other cemented knees;

    c.    The Optetrak  fixed bearing had the worst failure rate with a mean of 7.9% at 7 years as compared to all other cemented knees;

    d.    The Optetrak fixed bearing has worst failure rate with a mean of 9.6% at 10 years, as compared to all other knee implants. [3]

46.    By 2012, Defendants were aware that Optetrak Implants were failing at a rate higher than promoted.  Reports in the Manufacturer and User Facility Device Experience (MAUDE) indicate instances of revision due to "loose tibial component", "aseptic loosening", "polyethylene wear", "pain and visible loosening", and "pain, limited mobility, knee swelling and sensitivity" due to a "loose" joint. These early onset failure mode reports are representative of the increased rate of incidents of which Defendants had become internally aware.

47.    Upon information and belief, Defendants were informed by healthcare professionals who implanted the Defective Device that the devices were failing unusually early due to polyethylene wear.

---

[3] These statistics in the chart are expresses as the "Optetrak" v. the "Optetrak-RBK" which is the rotational bearing knee. This tibial plate also has a very high failure rate and is similar in design but has the polyethylene insert that rotates.

48.     Upon information and belief, instead of warning consumers and the medical community about the increased failure rates with its Optetrak Implants, Defendants engaged in a "silent recall" campaign where they slowly replaced all finned tibial trays with a new, more substantial design, referred to as "fit" trays and change of the polyethylene insert. Concurrent with this strategy of product replacement, Defendants also engaged in a campaign of misinformation where any incidents of early onset failure were blamed on surgeon specific factors instead of acknowledging problems with the tibial tray and polyethylene insert product itself.

49.     Upon information and belief, Defendants have made subsequent design changes to the Optetrak products without notifying healthcare professionals or patients that such changes were made in response to Exactech's knowledge of early failure rates of its Optetrak products.

50.     In the year 2015, Defendants had over $241 million in sales across all product lines.[4] Further, Defendants state in their 2015 Form 10-K, "to better meet the demand for revision surgeries, we began the initial launch of a new revision knee system in 2015."[5]

51.     Of the more than $241 million in sales, knee device sales accounted for over $70 million in sales, or 29.3% of all Defendants' sales in 2015.[6]

52.     In 2016, Defendants' revenue increased by 7%, up to $257.6 million with knee device sales increasing 4%.[7] Knee device sales for the fourth quarter of 2016 accounted for $19.8 million of this amount.[8]

53.     According to Exactech CEO and President David Petty, the increases in knee device revenue "reflect excellent surgeon acceptance of Exactech innovations, including our three new

---

[4] See Exactech, Inc. Form 10-K for the fiscal year ended December 31, 2015, https://www.exac.com/resource-library/investors/recent-filings/10-k-annual-report-1
[5] Id. at p. 4.
[6] Id.
[7] See Exactech, Inc. Form 8-K dated February 21, 2017, https://www.exac.com/resource-library/investors/recent-filings/8-k-current-report-12
[8] Id.

revision systems." Mr. Petty further stated that he anticipates the "revision knee rollout in the fourth quarter" of 2016 will "carry momentum into 2017." [9]

54.     A new Exactech knee implant, called "Truliant", was released in the second half of 2017.[10] Truliant received FDA 510(k) clearance, K170240, on February 23, 2017.

55.     Despite Defendants' claims in its promotional materials of over 30 years of successful outcomes with knee devices, Defendants knew of an unacceptably high early failure rate of their Optetrak knee implants, and multiple reports of polyethylene wear from a variety of sources.

56.     Based on information and belief, Defendants' knee implant devices are adulterated pursuant to 21 U.S.C. § 351 because, among other things, they failed to meet established performance standards, and/or methods, facilities, or controls used for their manufacture, packaging, storage or installation and are not in conformity with federal requirements. *See* 21 U.S.C. § 351.

57.     Based on information and belief, Defendants' Optetrak knee implant devices are misbranded because, among other things, they are dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. *See* 21 U.S.C. § 352.

58.     Based on information and belief, Defendants' knee implant devices are adulterated pursuant to 21 U.S.C. § 351 because Defendants failed to establish and maintain Current Good Manufacturing Practices ("CGMP") for its knee implant devices in accordance with 21 CFR § 820 *et seq.*

---

[9] *Id.*
[10] *Id.*

59.     Based on information and belief, Defendants failed to establish and maintain CGMP with respect to quality audits, quality testing, surveillance related to failures and process validation for its knee implant devices.

60.     Defendants had a duty to follow Current Good Manufacturing Practices. As a result of Defendants' failure to establish and maintain CGMP as set forth above, Defendants' knee implant devices were defective and failed, resulting in injuries to Plaintiff.

61.     If Defendants had complied with the federal requirements regarding CGMP, Defendants' knee implant devices would have been manufactured properly and would not have resulted in injuries to Plaintiff.

## PLAINTIFF SPECIFIC ALLEGATIONS

62.     Defendants designed, developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, warranted and/or sold the Defective Devices implanted in Plaintiff.

63.     Defectively designed and manufactured Optetrak Implant left the hands of Defendants in their defective condition. Defendants delivered the Optetrak Implants into the stream of commerce and allowed them it to be implanted in Plaintiff during two total knee arthroplasties.

64.     The Defective Device was defective for the following reasons:

a. the device contained an inadequate polyethylene component constructed with conventional polyethylene rather than more wear-resistant, stronger and available highly cross-linked polyethylene material ;

b. the device contained a polyethylene component with inadequate thickness, which, in combination with the size of the perimeter capture in the posterior region of the

tibial tray, created greater sensitivity to wear, cold-flow and delamination and metal-on-metal friction leading to the dissemination of metal debris;

c. the device contained a polyethylene component which was negligently designed with a built in slope, which further concentrated stress and overloaded forces on an already inadequate polyethylene component material;

d. the device did not include precautions or instructions for use for implanting physicians regarding sensitivity to excessive polyethylene wear when positioned with greater slope;

e. the device failed to contain instructions and precautions to implanting physicians regarding alignment and rotation to avoid stresses and overloaded forces given that implanting physicians were generally unaware of sensitivity in the design and weakness of materials that left the device prone to excessive polyethylene wear;

f. otherwise designing a product that overburdened forces and concentrated stress on a polyethylene component already prone to excessive polyethylene wear; and

g. otherwise providing inadequate precautions and instructions for use to physicians to account for the design and materials issues (identified above), including, but not limited, restrictions for use on certain patients based upon physical characteristics.

65.     Despite that advances that have taken place in the orthopedic industry to produce polyethylene that has superior wear characteristics and resistance to cold flow, delamination, oxidation, pitting and overall wear, in advance of the time-frame of the manufacture, marketing and sale of the Defective Device implanted in Plaintiff, the Defendant failed to incorporate these advances into the Defective Device and consciously chose to use an inferior polyethylene insert in the Defective Device.

66.     A defectively designed and manufactured Optetrak knee implant left the control of Defendants in its defective condition.  Defendants delivered the Defective Device into the stream of commerce and allowed it to be implanted in a total knee arthroplasty surgery in Plaintiff Michael Baker.

67.     On or around May 12, 2016, at Ochsner Medical Center, Plaintiff underwent a left total knee arthroplasty by Dr. George Chimento.  During this procedure, Plaintiff implanted with a Defective Device.

68.     Subsequent to his total knee arthroplasty, Plaintiff began to experience significant pain and difficulty ambulating, and was seen by his physician and other medical providers.

69.     During this revision surgery on April 10, 2018, it was discovered that patella was dislocated and had significant wear and the tibial insert had pitting that produced wear debris. During this surgery, the patella component and poly tibial insert were replaced with Optetrak components.   During the surgery, it was determined that Plaintiff's injuries were caused by premature polyethylene wear of the tibial insert, tibial base plate loading and other defects of his Optetrak Implant.

70.     Subsequent to the revision surgery, Plaintiff began to experience significant pain and swelling of the left knee which was determined to be the result of infection and/or failure of the Defective Device.

71.     As a direct and proximate result of Defendants placing the Defective Devices into the stream of commerce, Plaintiff required a knee revision surgery on his left knee on April 10, 2018, long periods of hospitalization and will likely require  a second revision surgery in the future.

72.     The failure of the polyethylene insert and the patella component were the result of a product defect as opposed to patient-specific causes or technique related causes of the index surgeon.

73.     Plaintiff's injuries were a direct and proximate cause of manufacturing and design defects in the Optetrak Implant which caused an early, failure of the polyethylene insert, patella component and/or tibial tray resulting in contact between components of the Optetrak Implant, thereby generating a debris field of foreign materials distributed within the knee capsule, and destroying Plaintiff's bone and tissue.

74.     As a direct and proximate result of Defendants placing the Defective Device into the stream of commerce, Plaintiff has suffered and continues to suffer both injuries and damages, including but not limited to: past, present and future physical and mental pain and suffering; past, present and future medical, hospital, rehabilitative and pharmaceutical expenses and other related damages.

## ESTOPPEL FROM PLEADING STATUTES OF LIMITATIONS OR REPOSE

65.     Plaintiff incorporates by reference the averments of the preceding paragraphs of the Complaint as if fully set forth at length herein.

66.     Plaintiff first became aware that there may be some connection between the defects in the his Exactech Optetrak Implant following his revision surgery on April 10, 2018 after his surgeon informed him of the findings during the revision surgery.

67.     Alternatively, Plaintiff invokes the doctrine of *contra non valentem* as he did not discover the defects and unreasonably dangerous condition of Defendants' Defective Device and the risks associated with premature failure, and could not reasonably have discovered the defects

and unreasonably dangerous condition until after revelations by his revision surgeon weeks after his April 10, 2019 revision surgery.

68.     In addition, Defendants are estopped from relying on any statutes of limitations or repose by virtue of their acts of fraudulent concealment, affirmative misrepresentations and omissions, which include Defendants' intentional concealment from Plaintiff, Plaintiff's health care professionals and the general consuming public that Defendants' Optetrak Implant was defective, unreasonably dangerous and carried with it the serious risk of developing the injuries Plaintiff has suffered while aggressively and continually marketing and promoting the Defective Device as safe and effective.

69.     Defendants had a duty to disclose that the Defective Device was defective, unreasonably dangerous and that the use of Defendants' Device carried with it the serious risk of early failure and revision surgery. Defendants breached that duty.

71.     Defendants did not notify, inform, or disclose to Plaintiff, Plaintiff's health care professionals or the general consuming public that Defendants' Optetrak Implant was defective and that its use carried with it the serious risk of developing the injuries Plaintiff has suffered and complained of herein.

72.     Because Defendants failed in their duty to notify Plaintiff, Plaintiff's health care professionals and the general consuming public that the Optetrak Implant was defective and, further, actively attempted to conceal this fact, Defendants should be estopped from asserting defenses based on statutes of limitation or repose.

73.     Accordingly, Plaintiff files this lawsuit within the applicable statutes of limitations, Plaintiff could not by exercise of reasonable diligence have discovered any wrongdoing, nor could he have discovered the causes of his injuries at an earlier time, and when Plaintiff's injuries were

discovered, their causes were not immediately known or knowable based on the lack of necessary information, which was suppressed by the Defendants.

**FIRST CAUSE OF ACTION**
**STRICT LIABILITY UNDER THE LOUISIANA PRODUCTS LIABILITY ACT**

74. Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs with the same force and effect as if more fully set forth herein.

75. Defendants are strictly liable to Plaintiff under the Louisiana Products Liability Act for the design defects (LSA-RS 9:2800.56), inadequate warnings (LSA-RS 9:2800.57), and breach of express warranty (LSA-RS 9:2800.58) caused by the Optetrak Implant.

76. Defendants have engaged in the business of designing, researching, manufacturing, marketing, supplying, promoting, packaging, selling, testing, and/or distribution of the Defective Devices. Through that conduct, Defendants knowingly and intentionally placed the Defective Devices into the stream of commerce with full knowledge that it reaches consumers, such as Plaintiff.

77. Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released the Defective Devices into the stream of commerce. In the course of same, Defendants directly advertised, marketed, and promoted the Defective Devices to the FDA, health care professionals, Plaintiff, and other consumers, and therefore had a duty to warn of the risks of high early failure rates associated with the implantation of the Defective Devices.

78. Defendants expected the Defective Devices to reach, and it did in fact reach, implanting orthopedic surgeons, health care professionals and consumers, including Plaintiff and

Plaintiff's physicians and medical providers, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

79.    The Defective Devices, as manufactured and/or supplied by Defendants, based on the specific design defects referenced above and other similar defects that may be identified during discovery in this matter, and later confirmed by its high early failure rate.  Defendants knew or should have known that the Defective Devices created significant risks of serious bodily harm to consumers, as alleged herein, and they failed to adequately warn consumers and/or their health care professionals of such risks.

80.    Defendants knew or should have known that the product created significant risks of serious bodily harm to consumers, as alleged herein, and they failed to adequately warn consumers and/or their healthcare professionals of such risks.

81.    The Defective Devices were defective, based on the specific design defects referenced above and other similar defects that may be identified during discovery in this matter, and later confirmed by its high early failure rate,  and unsafe such that it was unreasonably dangerous when it left the Defendants' possession and/or control, was distributed by Defendants, and implanted by Plaintiff's physician.

82.    The Defective Device's design created an unreasonable risk of early failure and resulting painful revision surgery.

83.    Defendants failed to warn or alert consumers, including Plaintiff and/or Plaintiff's physicians and medical providers, to the dangerous risks associated with the Defective Device, including the risk of early revision surgery.

84.    This defect caused serious injury to Plaintiff, who used the Defective Device for its intended purpose and in a reasonably anticipated manner.

85.     At all times herein mentioned, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, supply, warn, and take such other steps as necessary to ensure the Defective Device did not cause users to suffer from unreasonable and dangerous risks.

86.     Defendants negligently and recklessly designed, distributed, and promoted the Defective Device.

87.     Defendants had a continuing duty to warn Plaintiff and/or Plaintiff's physicians and medical providers of the dangers associated with the early failure of the Defective Device.

88.     Defendants, as designers, manufacturers, sellers, and/or distributors of medical devices, are held to the knowledge of an expert in the field.

89.     Plaintiff could not have discovered any defects in the Defective Device through the exercise of reasonable care and relied upon the skill, superior knowledge, and judgment of Defendants.

90.     Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that the Defective Device caused serious injuries, including early revision, they failed to exercise reasonable care to warn of the severity of the dangerous risks associated with its implantation. The dangerous propensities of the Defective Device, as referenced above, were known to the Defendants, or scientifically knowable to them, through appropriate research and testing by known methods, at the time they designed, distributed, supplied, or sold the Defective Device. Such information was not known to ordinary physicians who would be expected to implant the Defective Device.

91.     The Defective Device, as manufactured and/or supplied by Defendants, was unreasonably dangerous when used by consumers, including Plaintiff, in a reasonably intended manner without knowledge of this risk of serious bodily harm.

92.     Further, Defendants knew or should have known through post market surveillance and other methods that the Defective Device was indeed defective and resulted in a high risk of early failure, but they failed to communicate adequate information on the dangers and safe use of their product, taking into account the characteristics of and the ordinary knowledge common to physicians who would be expected to implant the Defective Device and monitor existing patients implanted with the device.

93.     In particular, Defendants failed to communicate the knowledge of high early failure rates that render the Defective Device unsafe for their ordinary, intended, and reasonably foreseeable uses, including the common, foreseeable, and intended use of the Defective Device.

94.     Defendants communicated information to health care professionals that failed to contain relevant notice of known high early failure rates that would enable health care professionals to implant safe and effective knee implant devices.  In particular, Defendants:

  a.   Disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the high early failure rate associated with the implantation of the Defective Devices;

  b.   Continued to aggressively promote the Defective Devices even after Defendants knew or should have known of the unreasonable risks from implantation;

  c.   Failed to provide information that accurately reflected the high early failure rate of the Defective Devices; and

d. Downplayed, or otherwise suppressed, through aggressive marketing and promotion the risks associated with the implantation of the Defective Devices.

95. To this day, Defendants have failed to adequately and accurately disclose the true risks of high early revision rates associated with implantation of the Defective Device, and unreasonably continue to deny that its failing product contains design defects that make the product unsafe.

96. Defendants are aware that premature polyethylene wear is harmful to the patient.

97. Due to the deficiencies and inadequacies of the Defective Device, it was unreasonably dangerous and defective as manufactured, distributed, promoted, advertised, sold, labeled, and marketed by the Defendants.

98. At the time Defendants' product left their control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the Optetrak Implant.

99. Had Defendants properly disclosed the risks associated with early failure of the Defective Device, Plaintiff and Plaintiff's surgeon would have avoided the risk of implantation of the Defective Devices and/or would have medically monitored Plaintiff differently after the Defective Devices were implanted in order to minimize and/or mitigate the damages which would result from the Defective Devices.

100. Had Defendants provided proper instructions for use, describing the sensitivities and limitations of the Defective Device, Plaintiff and Plaintiff's surgeon could have reduced the risks associated with the Defective Device, including polyethylene wear, early failure and metal-on-metal friction resulting in the dissemination of metal debris.

101.   Defendants expressly warranted that the Defective Device was safe and well accepted by users.  Plaintiff and his implanting surgeon relied on these representations. However, the Defective Device does not conform to these express representations because the Optetrak device fails prematurely.

102.   The Defendants are liable to Plaintiff for injuries caused by their willful conduct in failing to disseminate information related to the early failure of the Defective Devices.

103.   As a foreseeable, direct, and proximate consequence of Defendants' actions, omissions, and misrepresentations, Plaintiff suffered a painful knee revision surgery and other related health complications and a likely future revision surgery. Plaintiff has incurred and will continue to incur medical and related expenses. Plaintiff also has suffered and will continue to suffer diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages. Plaintiff has incurred and will continue to incur mental and physical pain and suffering.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for special and general damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands that the issues contained herein be tried by a jury.

## SECOND CAUSE OF ACTION
## BREACH OF WARRANTY IN REDHIBITION

104.   Plaintiff repeats, reiterates, and re-alleges all paragraphs of this Petition, with the same force and effect as if fully set forth herein.

105.   The Exactech Optetrak Implant contains a vice or defect which renders it useless or its use so inconvenient that consumers would not have purchased it had they known about the vice or defect.

106.    Pursuant to Louisiana Civil code article 2520, a seller warrants the buyer against redhibitory defects, or vices, in the thing sold.  The Optetrak Implant, which was sold and promoted by Defendants, possesses a redhibitory defect because it is unreasonably dangerous, as described above, which renders the Defective Device useless or so inconvenient that it must be presumed that Plaintiff or his implanting surgeon would not have used the device had they known of the defects.

107.    Defendants were aware of the substantial risks of early failure of the Defective Device but failed to fully disclose those risks to Plaintiff and his implanting surgeon.

108.    In accordance with Louisiana Civil Code article 2545, Defendants, as the manufacturers, distributors and sellers of the Optetrak Implant, are deemed to be aware of its redhibitory defects.

109.    Had Plaintiff been made aware of the defects contained in the Defective Device, he would not have used or purchased the Optetrak Implant.  This characteristic rendered the Defective Device unfit for its intended purposes.

110.    Defendants are liable to Plaintiff under the theory of redhibition as a consequence of the sale to Plaintiff a product unfit for its intended use.

111.    Plaintiff is entitled to the return of purchase price paid for the Exactech Optetrak Implant and other associated monetary injuries, including, but not limited to, insurance co-payments, interest on these amounts from the date of purchase, attorneys' fees and costs, pecuniary and non-pecuniary damages, as well as any other legal and equitable relief to which Plaintiff may be entitled.

## THIRD CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

112.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs with the same force and effect as if more fully set forth herein.

113.    Defendants owed a duty in all of their undertakings, including the dissemination of information concerning the Defective Device, to exercise reasonable care to ensure they did not create unreasonable risks of personal injury to others.

114.    Defendants disseminated to physicians, medical providers, and consumers – through published labels, marketing materials, direct communications, and otherwise – information that misrepresented the efficacy and longevity of the Defective Device with the intention that physicians, medical providers and consumers would rely upon that information in their decisions concerning whether to implant the Defective Device.

115.    Defendants, as the designers, manufacturers, sellers, promoters, and/or distributors of the Defective Device knew, or reasonably should have known, that health care professionals and consumers of the Defective Device would rely on information disseminated and marketed to them regarding the product when weighing the potential benefits and potential risks of implanting the Defective Device.

116.    Defendants failed to exercise reasonable care to ensure that the information they disseminated to health care professionals and consumers concerning the efficacy and longevity of the Defective Device was accurate, complete, and not misleading. As a result, Defendants disseminated information to health care professionals and consumers that was materially inaccurate, misleading, false, and unreasonably dangerous to consumers such as Plaintiff.

117.   Defendants, as designers, manufacturers, sellers, promoters, and/or distributors of the Defective Device, knew or reasonably should have known that surgeons would implant the Defective Device in reliance on the information disseminated by Defendants, and that the patients implanted with the Defective Device would suffer early failure and require revision surgery because the information disseminated by Defendants and relied upon by health care professionals and consumers, including Plaintiff, was materially inaccurate, misleading, or otherwise false.

118.   From the time the Defective Device was first tested, studied, researched, evaluated, endorsed, manufactured, marketed, and distributed, and up to the present, Defendants failed to disclose material facts regarding the safety, efficacy, and longevity of the Defective Device. Defendants made material misrepresentations to Plaintiff, Plaintiff's physicians and medical providers, the healthcare community, and the general public, including:

   a.   Stating that the Defective Device had been tested and found to be safe and effective implant for TKA;

   b.   Concealing, misrepresenting, and actively downplaying the severe risks of harm related to the implantation of the Defective Device, as compared to comparable alternative TKA devices; and

   c.   Misrepresenting and failing to disclose the Defective Devices' risk of unreasonable and dangerous early failure.

119.   Defendants made the foregoing representations without any reasonable ground for believing them to be true.

120.   These representations were made directly by Defendants, their sales representatives, and other authorized agents, and in publications and other written materials

directed to health care professionals, medical patients, and the public, including Plaintiff and Plaintiff's physicians.

121.   Defendants made these representations with the intent to induce reliance thereon, and to encourage purchase and implantation of the Defective Device.

122.   Defendants had a duty to accurately and truthfully represent to physicians, medical professionals and consumers, including Plaintiff, the truth regarding Defendants' claims that the Defective Devices had been tested and found to be a safe and effective TKA implant option.

123.   The misrepresentations made by Defendants were false and known by Defendants to be false at the time the misrepresentations were made.

124.   Defendants failed to exercise ordinary care in making their representations concerning the Defective Devices and in the manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce of the Defective Devices.

125.   Defendants engaged in a nationwide marketing campaign, over-promoting the Defective Device in written marketing literature, in written product packaging, and in direct-to-consumer advertising via print and internet advertisements and television commercial ads. Defendants' over-promotion was undertaken by touting the safety and efficacy of Defective Device while concealing, misrepresenting, and actively downplaying the serious, severe, and life-threatening risks of harm to patients implanted with the Defective Device, when compared to comparable alternative TKA implant options. Defendants negligently misrepresented the Defective Device's safety, efficacy, and longevity.

126.   Defendants' conduct, as described above, was reckless. Defendants risked the health of consumers and users of the Defective Device, including Plaintiff. Defendants had knowledge of the safety problems and suppressed this knowledge from the general public.

Defendants made conscious decisions for years not to redesign or re-label, or to adequately warn or inform the unsuspecting public.

127.    If Plaintiff and her physicians and medical providers had not been misled by the active misrepresentations and concealment of Defendants, they would have been alert to the problems with the Defective Device and the Defective Device would have been removed earlier, thereby greatly reducing the extent of Plaintiff's injuries, pain and suffering, and other damages.

128.    As a foreseeable, direct, and proximate consequence of Defendants' actions, omissions, and misrepresentations, Plaintiff suffered a painful knee revision surgery and other related health complications. Plaintiff has incurred and will continue to incur medical and related expenses. Plaintiff also has suffered and will continue to suffer diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages. Plaintiff has incurred and will continue to incur mental and physical pain and suffering.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for specific and general damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands that the issues contained herein be tried by a jury.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment of the U.S. Constitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, and severally, as follows:

a.    For general damages in a sum in excess of $75,000, the jurisdictional minimum of this Court;

b.    For medical, incidental and hospital expenses according to proof;

c.    For pre-judgment and post-judgment interest as provided by law;

d.    For consequential damages in excess of the jurisdictional minimum of this Court;

e.    For compensatory damages in excess of the jurisdictional minimum of this Court;

f.    For such further and other relief as this Court deems necessary, just and proper.


Dated: April 24, 2019                    _/s/ Nicholas R. Rockforte_____
                                         Nicholas R. Rockforte LA Bar No. 31305
                                         Christopher L. Coffin LA Bar No. 27902
                                         **PENDLEY, BAUDIN & COFFIN, L.L.P.**
                                         P.O. Box 71
                                         24110 Eden Street
                                         Plaquemine, Louisiana 70765
                                         Phone (225) 687-6396
                                         Facsimile (225) 687-6398
                                         nrockforte@pbclawfirm.com